IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| HEATHER BRAWLEY, as Personal Representative of the ESTATE OF DANIEL BRAWLEY,<br><br>        Plaintiff,<br><br>    vs.<br><br>OFFICER DAVID PUNT and the CITY OF BILLINGS,<br><br>        Defendants. | CV 15–03–BLG–DWM<br><br><br>OPINION and ORDER |

On January 6, 2013, Daniel Brawley was fatally shot by Billings Police Officer David Punt. His wife and personal representative, Heather Brawley, sued Officer Punt and the City of Billings in a 42 U.S.C. § 1983 action, alleging Daniel's death was caused by an unconstitutional use of excessive force. The parties each seek summary judgment on the question of liability. Officer Punt's motion for summary judgment is granted because even if the use of force was not objectively reasonable, the law at the time did not clearly establish that Officer Punt's conduct would violate the Constitution. Officer Punt is therefore entitled to qualified immunity. Likewise, the City's motion for summary judgment is granted because Chief St. John's actions do not show that he made a conscious,

affirmative choice to approve Officer Punt's actions and to adopt them as City policy, both of which are necessary to establish municipal liability.

## BACKGROUND[1]

On January 5 or early January 6, 2013, Daniel and Heather Brawley broke into an unoccupied home on Miles Avenue in Billings, Montana. Shortly after 9:00 a.m. on January 6, the break-in was discovered when the girlfriend of the homeowner encountered Daniel inside. She called 911, and police officers from the Billings Police Department were dispatched to the scene. The Brawleys found several firearms in the residence, took them, and then hid in a crawl space in the basement. A standoff ensued, and the Billings SWAT team was called in. The standoff lasted several hours, while the police negotiated a voluntary surrender.

The Brawleys were escorted from the home by the police and placed in flex cuffs with their hands behind their backs. The surrender itself was without incident. Heather was agitated upon being removed from the home, but Daniel appeared calm. She was placed in metal handcuffs and put in the back of a patrol car. Officer Punt was told to transport Daniel Brawley ("Brawley") separately.

---

[1] The facts are those stipulated to by the parties, (Doc. 22 at ¶ 4), those provided in support of the summary judgment motions, (Docs. 27, 31, 37, 54, 56 & 61), and those taken from video footage of the incident, (conventionally filed, including video from Officer Punt's patrol car, video from Officer Foster's patrol car, KTVQ video clip, and KULR video clip). The facts are undisputed unless otherwise indicated. Disputed facts are construed in favor of the nonmovant. *Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861, 1863 (2014) (per curiam).

Before placing Brawley in his patrol car, Officer Punt stored his service rifle in its case on the front seat of the cruiser in "patrol-ready" condition, meaning it was loaded with an ammunition magazine, with the hammer down, the chamber empty, and the safety on. There was also a shotgun in "patrol-ready" condition in an overhead rack in the front compartment of the cruiser. Strangely, Officer Punt left the keys to his cruiser in the ignition. Officer Punt took Brawley in the flex cuffs, patted him down, and placed him in the back driver's side seat of the police cruiser. He could not get the plexiglass security divider between the front and rear seat to go all the way up into a secure position. Even so, with the two loaded firearms in his police cruiser, keys in the ignition, and the inoperable security divider, he left the cruiser to talk to the other officers on the scene.

While Officer Punt was out of the cruiser, he saw a tan color in the partition between the front and rear of the vehicle. When he realized that Brawley was trying to get into the front seat he scrambled to get back to the cruiser. Brawley had removed one of the flex cuffs from his wrists, crawled over the back of the front seat of the cruiser, and got into the driver's seat. The prisoner put the cruiser in reverse and then drive and tried to flee the scene. While Brawley backed away in reverse, Officer Punt ran to the cruiser and was struck in a glancing way and knocked to the ground by the front, driver's side of the hood. The cruiser, still in

reverse, went up on the curb and hit a tree. Brawley then put the cruiser in drive and tried to go forward, fishtailing and spinning the rear wheels. Officer Punt, meanwhile unhurt, got up off the ground and ran toward the cruiser, drawing his service weapon and discharging it at the cruiser nine times. The time from when the cruiser hit the tree to when the first shot is fired is 3 seconds. Brawley was hit once and died as a result of a single gunshot wound. The first shot was likely the fatal shot, which entered the cruiser through the front passenger window and struck Brawley in the right armpit, passing through his chest. When Officer Punt fired his service weapon there were civilians in the area who, upon hearing the shots, dropped to the ground. Officer Punt, out of all the police on the scene, was the only officer to fire at the cruiser being driven away by Brawley.

The parties dispute Officer Punt's location relative to the cruiser at the time Brawley tried to escape. Officer Punt insists that he was in the direct line of the cruiser and that he feared for his life. The plaintiff claims the cruiser did not face Officer Punt during its forward acceleration but that as Officer Punt got up from the ground, the cruiser was headed down the street away from Officer Punt and other law enforcement personnel. The video footage of the incident does not blatantly contradict nor affirm either parties' rendition of the facts. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different

stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Accordingly, certain factual disputes remain "genuine" and must be construed in favor of the nonmovant. *Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861, 1863 (2014) (per curiam).

Officer Punt was posted outside the house during the standoff and was aware of Brawley's involvement. While Heather made numerous statements after the fact regarding Brawley's mental state, this information has no bearing on the Court's analysis because it was not known to Officer Punt or law enforcement at the time of the shooting.[2] *Graham v. Connor*, 490 U.S. 386, 397 (1989) (analyzing reasonableness "in light of the facts and circumstances confronting" the officer); *Deorle v. Rutheford*, 272 F.3d 1272, 1281 (9th Cir. 2001) ("[A]n officer's use of force must be objectively reasonable based on his contemporaneous knowledge of the facts."). The video footage shows Punt driving up to the scene shortly before the killing took place. The defendants claim, however, that before the January 6, 2013 incident, Officer Punt knew of Brawley based on other calls

---

[2] Heather stated in her deposition that Brawley may have been "in a mania" or experiencing a bipolar episode and that he was not "in the right frame of mind" or did not have "any control of his mind." (Doc. 31-1 at 56.) Heather also stated that Brawley repeatedly asserted that he was "not going back to jail." (*Id.* at 47.)

involving him. Other than Punt's statement that he knew there had been warrants for Brawley, the nature and extent of that knowledge is not clear from the record. (*See* Depo. Punt, Doc. 31-1 at 11 (discussing prior call for Brawley on pages 17 and 19 but omitting page 18).)

**STANDARD**

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248. "[I]n ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in h[er] favor." *Tolan*, 134 S. Ct. at 1863 (internal quotation marks and alterations omitted).

**ANALYSIS**

**I.     Officer Punt's Liability**

The outcome of this case seems inevitable given the status of the Supreme

Court's qualified immunity jurisprudence in vehicular flight cases. But it shouldn't be. The jury of any given community in our federal system plays a significant constitutional role. When violence occurs, whether prosecuted by the state or claimed as a violation of the constitutional prohibition against the use of excessive force, the community should have a role. Part of that role is structural. Part of that role is based on the principle of transparency. Part of that role is based on a community's judgment of the propriety and extent of force that is justifiable. When lethal force is employed by the police it should not be immunized by a judge who is confronted with an argument about qualified immunity, unless, and only unless, the law is unclear. It defies common sense and logic to reduce the level of generality in this analysis to a level of specificity that randomly occurs. Such a view means the conduct of officers using deadly force to kill another human being, a citizen, is never subject to the transparency of a public trial where the objective reasonableness of the deadly use of force is measured by a properly instructed jury. *See Lytle v. Bexar Cnty., Tex.*, 560 F.3d a404, 411-12 (5th Cir. 2009) (reasserting that "the reasonableness of an officer's conduct under the Fourth Amendment is often a question that requires the input of a jury" because "we rely on the consensus required by a jury decision to help ensure that the ultimate legal judgment of 'reasonableness' is itself reasonable and widely

shared"). Instead, "I was in fear for my life," and "I was concerned about my fellow officers," becomes a rote post hoc incantation. The core question is whether any community wants to immunize police officers who kill a person whenever there is an escape attempt of a fleeing vehicle. Surely the cases from our Supreme Court cannot be so broadly viewed, and yet, that seems the case.

 While circuit courts have generally held that the immediacy of the danger posed by a fleeing driver raises factual questions, *see, e.g.*, *Gonzalez v. City of Anaheim*, 747 F.3d 789, 796-97 (9th Cir. 2014); *Adams v. Speers*, 473 F.3d 989, 993-94 (9th Cir. 2007); *Foster v. Patrick*, 806 F.3d 883, 888-89 (6th Cir. 2015); *Lytle*, 560 F.3d at 412-18, the Supreme Court has never found the use of deadly force in connection with a car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity, *see Mullenix v. Luna*, ___ U.S. ___, 136 S. Ct. 305, 310 (2015) (per curiam) (collecting cases). It is under this conflicting framework that this case must be resolved.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). Where qualified immunity is claimed, the question is: "Taken in

8

the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Questions of qualified immunity involve a two-pronged inquiry. *Tolan*, 134 S. Ct. at 1865. The first prong is whether the facts, taken in the light most favorable to the party asserting injury, show the officer's conduct violated a federal right. *Id.* The second prong is whether the law was clearly established. *Id.* at 1866. "If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." *Brosseau*, 543 U.S. at 198. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 136 S. Ct. at 308 (internal quotation marks omitted). There need not be a case directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate. Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks and citations omitted).

There is discretion to decide the order in which to address this two-prong test. *Pearson*, 555 U.S. at 236. When the facts are construed in favor of the

plaintiff, the circumstances here give rise to a constitutional violation. On the

other hand, because the law may not be clearly established, Officer Punt could be

entitled to qualified immunity as a matter of law. The constitutional question is

addressed first below. *See Plumhoff v. Rickard,* ___ U.S. ___, 134 S. Ct. 2012,

2020 (2014) (noting that while *Pearson* allows courts to begin with either

question, addressing whether the officer's conduct violated the Fourth Amendment

is "beneficial" to "developing constitutional precedent" (alteration omitted)).

## A.    Fourth Amendment Violation

Apprehension by use of deadly force is a seizure subject to the

reasonableness requirement of the Fourth Amendment. *Tennessee v. Garner,* 471

U.S. 1,7 (1985); *Brosseau,* 543 U.S. at 197.

> The "reasonableness" of a particular use of force must be judged from
> the perspective of a reasonable officer on the scene, rather than with the
> 20/20 vision of hindsight. . . . The calculus of reasonableness must
> embody allowance for the fact that police officers are often forced to
> make split-second judgments—in circumstances that are tense,
> uncertain, and rapidly evolving—about the amount of force that is
> necessary in a particular situation.

*Graham,* 490 U.S. at 396-97. "Determining whether the force used to effect a

particular seizure is 'reasonable' under the Fourth Amendment requires a careful

balancing of the nature and quality of the intrusion on the individual's Fourth

Amendment interests against the countervailing governmental interests at stake."

10

*Id.* at 396 (internal citations and quotation marks omitted). This balancing test requires judges to evaluate "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* This case is focused on the most important *Graham* factor, whether Brawley posed an immediate threat to Officer Punt or others at the time he was shot dead. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011). A "simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Id.* at 441-42 (internal quotation marks omitted).

The number of cases addressing police car chases and fatal shootings should tell us something about the consequences of the doctrine of qualified immunity. Even so judges "must still slosh . . . through the factbound morass of 'reasonableness.'" *Scott*, 550 U.S. at 383. "Nearly any suspect fleeing in a motor vehicle poses some threat of harm to the public. As the cases addressing this all-too-common scenario evince, the real inquiry is whether the fleeing suspect posed such a threat that the use of deadly force was justifiable." *Lytle*, 560 F.3d at 415 (emphasizing that *Scott v. Harris* did not declare "open season" on suspects fleeing in motor vehicles). "[A] suspect that is fleeing in a motor vehicle is not so

inherently dangerous that an officer's use of deadly force is *per se* reasonable. In assessing the reasonableness of a police officer's use of force, [courts] must instead delve into the facts and circumstances of each case." *Id.* at 416. Here, Officer Punt gives the rote recitation of *Agarano* as justification for his use of force: fear for his own safety and fear for the safety of others. Construing the facts in the light most favorable to the plaintiff, a jury could find that Officer Punt's use of deadly force was not reasonable under the circumstances. There are three videos where in my view raise serious issues of fact about not only what happened but also whether the "fear of personal safety" argument would be convincing to a jury in Billings, Montana.

The Ninth Circuit found an officer's shooting of a fleeing motorist was unreasonable, or potentially so, where the driver posed a lesser or disputed risk of harm. In *Gonzalez*, an officer shot a van's driver in the head from close range as the van accelerated forward. 747 F.3d at 792-93. Because there was no evidence that either the officer or his partner were in danger of being hit and there was no indication that anyone else was in danger, the court held that a jury could find the officer did not act reasonably. *Id.* at 796-97. While the Ninth Circuit held no constitutional violation occurred where an officer shot the driver of a minivan because he feared for the immediate safety of his fellow officer, who he believed

may have been—or was in the process of being—run over by the suspect, *Wilkinson v. Torres*, 610 F.3d 546, 551-52 (9th Cir. 2010), the court reaffirmed in *Gonzalez* that its precedent does not stand for the proposition that the threat of sudden acceleration always justifies the use of deadly force, 747 F.3d at 796. Rather, all the facts surrounding the incident, including the failure to consider alternative, lesser applications of force and the failure to provide a warning, if practicable, should be accounted for. *Id.* at 797; *but see Mullenix*, 136 S. Ct. at 210-11 (holding that the officer did not need to consider alternatives). Similarly, in *Adams*, where a suspect led police on a chase "largely within the speed limit" for over an hour, an officer twice rammed the suspect's vehicle and later, without warning, shot and killed the suspect as the suspect's vehicle rolled away. 473 F.3d at 991-92. The Ninth Circuit found it "obvious" that "[n]o officer acting reasonably within these circumstances could have believed that he could use deadly force to apprehend" the suspect. *Id.* at 993-94.

Several cases from other circuits with facts similar to this case also provide useful guidance. In *Foster v. Patrick*, an officer approached a woman and her two children walking down the median of an interstate in Tennessee. 806 F.3d 883, 885 (6th Cir. 2015). The officer exited his vehicle with the motor still running and asked her why she was walking on the highway and insisted she could not remain

13

there. *Id.* The officer, believing the woman's intended ride was not imminent, told her that he was going to give them a ride and if she refused, he was going to take her to jail. *Id.* At this point the accounts vary: the officer claims the woman came toward him with a knife and he drew his weapon while the children recount that their mother did not pull a knife but jumped on the officer's back. *Id.* at 885- 86. Either way, following her altercation with the officer, the woman jumped in the police car and drove off. *Id.* The officer fired four or five times, told her to get out of the cruiser, and then fired additional rounds as she pulled out onto the highway. *Id.* The officer fired thirteen or fourteen shots in total, eight of which made contact with the woman. *Id.* at 886.

Under those facts, the Sixth Circuit held that the officer's use of force was not objectively reasonable because even assuming that the woman had assaulted the officer, the struggle between them had terminated and she was fleeing at the time he shot her. *Id.* at 887 ("[W]hile such action by a suspect justifies force, it does not justify *deadly force*, especially when the struggle has concluded and the suspect is in flight." (emphasis and alteration in original)). The court further emphasized that no one was in the cruiser's path and nothing suggested the fleeing woman would endanger others. *Id.* at 887-88. In this Sixth Circuit case, like here, there were two deadly weapons in the cruiser, a loaded shotgun above the driver's

14

seat and a loaded rifle in the trunk. *Id.* at 888-89. The court concluded, however, that "nothing from the facts suggests that [the woman] knew about the weapons in the police cruiser or attempted to gain access to either of them." *Id.* at 889. While the court acknowledged the danger present when someone steals a police car, it concluded that such danger, without more, is "not so grave as to justify the use of deadly force," relying in part on an earlier Sixth Circuit case, *Smith v. Cupp*, 430 F.3d 766, 773 (6th Cir. 2005).

In *Smith*, a suspect was arrested for making harassing telephone calls, cuffed, and placed in the back of a police car, and the car was left running for the air conditioning. 430 F.3d at 769. There was no security partition between the front and back seats. *Id.* While the officer was out of the cruiser speaking to a tow truck driver, the suspect climbed into the front seat and took control of the cruiser and accelerated forward. *Id.* The officer ran toward the cruiser with his firearm drawn and fired four times. *Id.* at 770. In finding a constitutional violation, the court focused on the evidence presented by the plaintiffs that the fatal shot was fired after the police car passed the officer and that there was no immediate danger to anyone in the vicinity. *Id.* at 774-75. The court also noted the driver was previously compliant and arrested for a non-violent offense. *Id.*

A Fifth Circuit case is also informative. In *Lytle v. Bexar County, Texas*, an

officer responded to a report of threatened domestic violence. 560 F.3d 404, 407 (5th Cir. 2009). The officer knew the suspect was a car thief driving a stolen car, was on bond for charges of felony theft, and was unlawfully carrying a weapon. *Id.* After a quarter- to a half-mile chase with speeds in the thirty-mile-per-hour range, the suspect's vehicle collided with another car, came to a stop on a residential street, and began backing up toward the officer's car. *Id.* The officer fired two shots into the back of the suspect's vehicle, killing a passenger. *Id.* The court held that a jury could conclude that the fleeing car posed some threat of harm as the chase took place at high speeds within a residential area, there were children playing nearby, and the car struck another vehicle. *Id.* at 416. But, the court concluded that a jury could also find the car "did not pose a sufficient threat of harm such that the use of deadly force was reasonable." *Id.* The pursuit was short, there were no bystanders in the path of the vehicle, and the vehicle appeared to be a good distance down the block from the officer. *Id.* While the fleeing car's collision with another vehicle gave the court some pause, it determined "the jury should assess the depravity that this collision evidenced." *Id.* at 417.

With these cases in mind, the question here is whether Brawley posed a threat to Officer Punt. Construing the facts in the plaintiff's favor insofar as they are consistent with the video footage, *Scott*, 550 U.S. at 380, a jury could conclude

16

that he did not. Officer Punt did not start firing his weapon until after the cruiser hit him. Punt ran toward the cruiser while it was reversing in an arc, made contact with the driver's side of the cruiser and hood, and then slid off the front of the cruiser. After he was on the ground, the cruiser continued to reverse away from him along its arced path. Punt then got up and approached the cruiser on foot during the cruiser's forward acceleration apparently in a direction where he was not in the zone of danger where he might be hit by the accelerating cruiser. At the point he fired, the cruiser was no longer facing him, but parallel to him as the first and fatal shot went through the passenger window into Brawley's side. Officer Punt then continued to shoot at the right side and rear of the cruiser as it accelerated down the street. When the cruiser crashed into a pickup, Officer Punt turned away from the catastrophe and took a few steps away from the cruiser before turning back around and running back to Brawley. None of the many officers on the scene drew a weapon or fired a shot despite seeing, or hearing, the whole incident play out. A reasonable jury could conclude that, similar to the situations in *Foster*, *Smith*, and *Lytle*, Officer Punt was not in immediate danger at the time he fired. *Compare Cowan ex. rel Est. of Cooper v. Breen*, 352 F.3d 756, 763 (2d Cir. 2003) (finding a constitutional violation where officer was not in front of vehicle but substantially off to side when he fired fatal shot), *and Scott v.*

17

*Edinburg*, 346 F.3d 752, 757 (7th Cir. 2003) (concluding a genuine issue of material fact existed as to whether officer was compelled to fire to protect himself when car may have been moving away at the time he fired), *with Hathaway v. Bazany*, 507 F.3d 312, 321-22 (5th Cir. 2007) (no constitutional violation where officer fired contemporaneously with being struck by vehicle).

While it may have been objectively reasonable for Officer Punt to shoot at one point, reasonableness changes with the circumstances. *See Waterman v. Batton*, 393 F.3d 471, 482 (4th Cir. 2005) (holding that officers are required to consider new information regarding passing threat and it was not objectively reasonable for them to continue firing at the car in question after it passed them); *Lytle*, 560 F.3d at 414 (holding that the officer may have had sufficient time to perceive that threat passed by the time he fired); *but see Wilkinson*, 610 F.3d at 552 (holding that an officer need not reevaluate whether a deadly threat has been eliminated after the firing of each shot during nine-second, close quarters situation where officer feared for the safety of another officer). While less than thirty seconds passed between the time Officer Punt first ran toward the cruiser and when he fired the final shot, (Officer Punt SUF, Doc. 31 at ¶¶ 41, 67-70), Officer Punt's proximity to the cruiser and the threat it posed to him changed dramatically in that time. He did not fire at first and it was a mere six seconds from when he

saw Brawley reverse the cruiser until he was at the driver's side door. Two seconds later he was on the ground being tossed by the inertia of the cruiser's rearward movement. Four seconds later he was on his feet drawing his firearm. Three seconds later, as the cruiser moves away, he fires the first of many bullets at Brawley. Construing the facts in the plaintiff's favor, a jury could find even if there was a sufficient risk to Officer Punt at the time the cruiser initially hit him, there was no immediate risk to Officer Punt's safety at the time the shots were fired. *Lytle*, 560 F.3d at 414.

The next question is whether Brawley posed an immediate threat to others. Here, a jury could conclude, as the courts determined in *Foster*, *Smith*, and *Lytle*, that he did not or that if he did, Officer Punt's response was not reasonable under the circumstances. "[A]s a general matter, an officer may not use deadly force once the car moves away, leaving the officer and bystanders in a position of safety." *Cass v. City of Dayton*, 770 F.3d 368, 375 (6th Cir. 2014) (internal quotation marks omitted). "An officer may, however, continue to fire at a fleeing vehicle even when no one is in the vehicle's direct path when the officer's prior interactions with the driver suggest that the driver will continue to endanger others with his car." *Id.* (internal quotation marks omitted).

Some courts have found that the use of deadly force is reasonable where it

19

followed a prolonged, highspeed chase. *See Scott*, 550 U.S. at 386 ("A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death."); *Plumhoff*, 134 S. Ct. at 2021-22 (holding the force used was justified after fleeing vehicle stopped but was intent on resuming flight); *Cole v. Brown*, 993 F.2d 1328, 1333-34 (8th Cir. 1993) (holding no constitutional violation where suspect driving an eighteen wheeler led officers on high-speed chase for over 50 miles forcing others off the road and running a roadblock). Some courts have found that the use of deadly force is reasonable where a suspect is willing to risk injury to others in the process of escape. *See Waterman*, 393 F.3d at 479-80 ("Waterman's aggressiveness toward officers trying to capture him suggested he was about to turn toward officers not yet in his direct path."); *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992) (suspect had demonstrated he was willing to do just about anything in order to evade capture); *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007) ("While there are no pedestrians or vehicles in the immediate field of view of the camera in [the officer]'s cruiser, there can be no question that [the driver]'s reckless disregard for the safety of those around him in attempting to escape posed a threat to anyone in the vicinity.").

20

Nevertheless, a jury should be allowed to assess the nature of the short chase here, the fact that Brawley hit both Officer Punt in a glancing blow and reversed into a tree in his attempt to flee, the severity of the escape involved, and all the other circumstances in the case, *Lytle*, 560 F.3d at 417, including the fact that there were no bystanders in the immediate path of the vehicle as it accelerated forward, *Foster*, 806 F.3d at 888. Indeed, one of the videos shows two civilians on the sidewalk down the block from where the cruiser backed into a tree. (City Ex. 5, Doc. 37-5 at :32-34 (conventionally filed)). While bystanders in the immediate vicinity may have been at risk, *Scott*, 346 F.3d at 759, the greater risk may have been from one of Officer Punt's nine shots going wide. As was the case in *Lytle*, a jury could accept Officer Punt's version of the facts but might be troubled by his firing of his sidearm down the block in a residential area and find that it "posed a risk that the shots might strike an unintended target." 560 F.3d at 412-13. Thus, even assuming Brawley posed a significant threat of harm, a jury could conclude that Officer Punt's killing him in response to that threat was unreasonable. *See id.* at 413; *see also Cowan*, 352 F.3d at 763 (explaining that even if the officer is in grave danger, the decision to shoot can still be unreasonable if shooting may put the officer or others in even greater danger); *c.f. Vaughan v. Cox*, 343 F.3d 1323, 1332-33 (11th Cir. 2003) ("[A] reasonable officer

21

would have known that firing into the cabin of a pickup truck, traveling at approximately 80 miles per hour on Interstate 85 in the morning, would transform the risk of an accident on the highway into a virtual certainty."). Moreover, Officer Punt testified in his deposition that he did not think there were civilians in the immediate area because the streets had been cordoned off and the surrounding houses evacuated. (Doc. 31-1 at 28.) While Officer Punt's subjective belief is irrelevant,[3] the fact that no other officers fired at Brawley may show the lack of danger was not just known to Officer Punt, but an objective reality.

Officer Punt argues that Brawley's involvement in the immediately preceding standoff and burglary is indicative of the threat he posed. That knowledge is tempered, however, by the fact that Brawley's previous conduct terminated before he stole the cruiser and Brawley was calm after his arrest and restrained in flex cuffs. *Foster*, 806 F.3d at 887. It is undisputed that Brawley was fleeing at the time he was shot. Even assuming his theft of the car was a second crime, that action alone does not justify the use of deadly force. *Id.*; *Smith*, 430 F.3d at 773. Nor does the mere fact that the car was a police car. While a

---

[3] Equally, the plaintiff's argument that Officer Punt acted out of embarrassment and humiliation is not relevant. Officer Punt's underlying intent or motivation is immaterial; the only question before the Court is one of objective reasonableness. *Graham*, 490 U.S. at 397; *Cass*, 770 F.3d at 377. That must be measured against the conduct of all the other officers at the scene, none of whom fired a weapon, all of whom were aware of what was going on once Brawley backed the cruiser into a tree.

22

fully marked and fully equipped police cruiser has a greater potential for causing harm, *see Long v. Slaton*, 508 F.3d 576, 582-83 (11th Cir. 2007) (collecting cases on unlawful uses of a stolen police cruiser), that fact alone does not justify the use of deadly force, *Smith*, 430 F.3d at 774-75; *Foster*, 806 F.3d at 887. There is no indication that Brawley was going to use the cruiser for anything other than escape or that Brawley knew about the weapons or attempted to use or gain access to either of them. *Foster*, 806 F.3d at 888-89.

Considering the circumstances of this case in the light most favorable to the plaintiff, a jury could conclude that Brawley was not an immediate threat to Officer Punt or others at the time he was shot and killed. Even if a jury determined that he posed a threat, it could find that Officer Punt's response to that threat was unreasonable.

## B. Clearly Established Right

Whether a right is clearly established is based on the specific context of a case. *Mullenix*, 136 S. Ct. at 308. The Supreme Court has always found that an officer is entitled to qualified immunity in a shooting involving a fleeing vehicle. *Id.* at 310. The Supreme Court always holds that the law in such cases was not clearly established. *Brosseau*, 543 U.S. at 200 (applying the law in 1999); *Plumhoff*, 134 S. Ct. at 2024 (again in 2004); *Mullenix*, 136 S. Ct. at 312 (and

23

again in 2010). As a result, the law would only be clearly established for the purposes of this case (1) if the facts were so markedly different from those three cases as to make it distinguishable or (2) a significant change in the law occurred between 2010 and 2013. *Plumhoff*, 134 S. Ct. at 2023. Neither is the case here. While I believe our Ninth Circuit law on qualified immunity is the better approach, I see no way around the view of the Supreme Court.

The circumstances of this case are comparable to *Brosseau*, *Plumhoff*, and *Mullenix*. *Brosseau* involved a possibly armed suspect who got into a car, did not engage in a chase, and posed, at most, a potential threat to people in area. 543 U.S. at 195-97 (the shooting officer "believed" suspect posed a threat to other citizens who "might" be in the area). In *Plumhoff*, the suspect was involved in a high-speed chase but was shot after he stopped the car because the police thought he would resume his dangerous flight. 134 S. Ct. at 2021-22. The suspect in *Mullenix* was armed, threatened to shoot officers in pursuit, and led officers on a high-speed chase down a highway. 136 S. Ct. at 306-07. There, the Court noted that previous excessive force cases revealed only a "hazy legal backdrop" from which to compare the officer's actions. *Id.* at 309. As those same cases provide the basis for the law here, the law was equally opaque under these circumstances.

Here, Officer Punt confronted a potentially armed, recently-arrested

individual set on escaping who was involved in a previous prolonged standoff with law enforcement. The relevant inquiry is whether existing precedent places the conclusion that Officer Punt acted unreasonably in these circumstances "beyond debate." *Id.* While *Foster*, *Smith*, and *Lytle* come close, none of the precedent "squarely governs" the facts here. *Mullenix*, 136 S. Ct. at 309. Under *Mullenix*, given Brawley's conduct, it would be difficult to say that only someone "plainly incompetent" who "knowingly violates the law" would have acted as Officer Punt did. *Id.* (alteration omitted). Consequently, while I disagree, Officer Punt is entitled to qualified immunity even if he was mistaken as the level of force reasonable under the circumstances. *See Saucier*, 533 U.S. at 205 ("An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.").

*Mullenix* gives great cause for consternation. It provides no guidance on the constitutionality of similar conduct in future cases but instead stands for the proposition that a suspect fleeing in a car always poses some sort of threat and that, due to the nature of that threat, it is not clearly established—and likely never will be—that deadly force cannot be used against that suspect. It seems to do what

*Lytle* was concerned *Scott* may be interpreted to do, i.e. declare "open season" on fleeing motorists. *See Lytle*, 560 F.3d at 415. While couched as a discussion on whether the law was "clearly established," *Mullenix* may have the practical effect of eviscerating the Fourth Amendment reasonableness analysis beyond all usefulness in the car-chase context. Moreover, it is vexing that the applicable law in this all-too-common scenario remains "unclear" despite at least four Supreme Court decisions and over thirty circuit court decisions addressing the use of deadly force in vehicular flight situations. However, because the law of the Supreme Court on the use of deadly force in such circumstances compels the conclusion that the law was not clearly established specifically in the context of this case, Officer Punt is entitled to qualified immunity. A far better resolution is to let a jury decide if the fleeing suspect is fair game for the use of deadly force.

## II.    The City's Liability

While local governments may be sued under 42 U.S.C. § 1983, they cannot be held vicariously liable for their employees' constitutional violations. *Monell v. Dept. of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978). However, a municipality can be held liable under § 1983 if it had a "deliberate policy, custom, or practice that was the 'moving force' behind the constitutional violation." *Whitaker v. Garcetti*, 486 F.3d 572, 581 (9th Cir. 2007). A plaintiff can establish

such a policy by showing "that the municipality's deliberate indifference led to its omission and that the omission caused the employee to commit the constitutional violation," *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1186 (9th Cir. 2002), or that "'the individual who committed the constitutional tort was an official with final policy-making authority' or such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it,'" *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 2002)). The plaintiff must show both causation-in-fact and proximate causation. *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013). A municipality is not automatically liable under § 1983 if an officer applies a policy in an unconstitutional manner. *Ewing v. City of Stockton*, 588 F.3d 1218, 1235 (9th Cir. 2009) (citation omitted). Here, the plaintiff's claim against the City is limited to Chief St. John's alleged ratification of Officer Punt's use of force; that claim lacks merit.[4]

Municipal liability can exist if an official with final policy-making authority ratifies a subordinate's unconstitutional decision or action and the basis for it.

---

[4] The plaintiff's claim also fails under the other formulations of *Monell* liability. There is no proof in the record of longstanding practices or customs as to constitute standard operating procedures or policies, *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996), or that there was a failure to train, *Clouthier*, 591 F.3d at 1249.

27

*Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996); *Clouthier*, 591 F.3d at 1250. "There must . . . be evidence of a conscious, affirmative choice on the part of the authorized policymaker." *Clothier*, 591 F.3d at 1250 (internal quotation marks omitted). The mere fact that a final policymaker does not overrule a subordinate is not sufficient. *Gillette*, 979 F.2d at 1348; *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004). "For there to be ratification, there must be 'something more' than a single failure to discipline or the fact that a policymaker concluded that the defendant officer's actions were in keeping with the applicable policies and procedures." *Kong Meng Xiong v. City of Merced*, 2015 WL 4598861, at \*29 (E.D. Cal. July 29, 2015) (internal quotation marks omitted).

Here, the plaintiff's ratification argument is based entirely on Chief St. John's statement at the Coroner's Inquest that he "believe[d] that Officer Punt's use of deadly force, based on the totality of the circumstances, specifically at the moment when the vehicle was driving at him, was justified, it was within [the City's] policy and guidelines as stipulated therein." (Coroner's Inquest Tr., Doc. 28-1 at 408-09.) The plaintiff argues that Chief St. John disguised or hid the unjustified nature of Officer Punt's actions, establishing a policy of deception and justification for the unauthorized use of force. Contrary to the plaintiff's argument, however, Chief St. John's actions are insufficient to show that he made

a conscious, affirmative choice to approve Officer Punt's actions and adopt them as policies. There must be something more.

In *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991), the court found sufficient evidence of ratification in light of the obviously flawed investigation of the plaintiff's excessive force complaint where the incident was investigated by the unit responsible for the constitutional violation, there were gaps in the investigation that went unchallenged by the chief, and the investigation was found unreliable based on a two-year study of Los Angeles Police Department complaints. Unlike *Larez*, the plaintiff cites no evidence other than Chief St. John's review of the investigation and his statement at the Coroner's Inquest. This alone is insufficient to establish ratification. *See Peterson v. City of Forth Worth, Tex.*, 588 F.3d 838, 848 (5th Cir. 2009) (finding no ratification where the chief of police determined after investigation that the officers complied with department policies). There is no evidence of a causal connection between Chief St. John's acceptance of the investigation and conclusion and the alleged violation of Brawley's constitutional rights. *Kong Meng Xiong*, 2015 WL 4598861, at *30. Accordingly, the City is entitled to summary judgment as to the plaintiff's claims

against it under *Monell*.[5]

## III. Other Constitutional Claims

The plaintiff also brings claims under the Fifth and Fourteenth
Amendments. The plaintiff's Fifth Amendment claim fails as a matter of law
because the Due Process Clause of the Fifth Amendment applies to federal, rather
than state, action. *Dusenbery v. United States*, 534 U.S. 161, 167 (2002); *Lee v.
City of L.A.*, 250 F.3d 668, 687 (9th Cir. 2001). The plaintiff's Fourteenth
Amendment substantive due process claim also fails as the Supreme Court has
previously held that "*all* claims that law enforcement officers have used excessive
force—deadly or not—in the course of an arrest, investigatory stop, or other
'seizure' of a free citizen should be analyzed under the Fourth Amendment and its
'reasonableness' standard, rather than under a 'substantive due process'
approach." *Graham*, 490 U.S. at 395 (emphasis in original).[6]

## CONCLUSION

In my view, this case should be tried to a jury. However, in light of our
Supreme Court's cases on deadly force in car chases, it won't be. Accordingly, IT

---

[5] Because the City's motion for summary judgment is granted as to the issue of liability, the City's wrongful death damages argument is not addressed herein.

[6] Substantive due process is generally limited to familial assertion claims, *see Porter v. Osborne*, 546 F.3d 1131, 1137 (9th Cir. 2008), or claims by those in a nonseizure, nonprisoner context, *see Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998). Neither is the case here.

IS ORDERED that the plaintiff's motion for partial summary judgment (Doc. 26) is DENIED. Officer Punt's motion for summary judgment (Doc. 29) and the City's motion for summary judgment (Doc. 35) are GRANTED.

IT IS FURTHER ORDERED all other motions are DENIED as MOOT.

IT IS FURTHER ORDERED that the Clerk of Court is directed to enter judgment in favor of the defendants and close this case.

Dated this ___11th___ day of May, 2016.

Donald W. Molloy, District Judge
United States District Court